**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CENTORIA GUNTHER and ALYSSIA NANEZ, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| v. | |
| COMCAST CABLE COMMUNICATIONS LLC, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Centoria Gunther and Alyssia Nanez ("Plaintiffs"), by and through undersigned counsel, files this Class Action Complaint individually and on behalf a class of all similarly situated persons against Defendant Comcast Cable Communications LLC ("Comcast" or "Defendant"). Plaintiffs base the following allegations upon information and belief, investigation of counsel, and his own personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against Comcast for its failure to properly secure and safeguard highly valuable, protected, personally identifiable information including, *inter alia*, customers' usernames and hashed passwords, names, contact information, last four digits of social security numbers, dates of birth, and secret security questions and answers (collectively, "PII"), failure to comply with industry standards to protect information systems that contain PII, and failure to provide adequate notice to Plaintiffs and other members of the Class that their PII had been accessed and compromised.

2.      Comcast owns and operates Xfinity—one of the largest companies in the

telecommunications sector, and provides internet services and products, cable television, a mobile 5G network, and landline telephone services and products to individuals and businesses across the United States.

3.    To obtain Xfinity's services, customers are required to entrust Comcast with their PII, which Comcast uses in order to perform its regular business activities.

4.    Between October 16 and October 19, 2023, hackers exploited a critical-rated, unpatched security vulnerability, accessed Comcast's internal systems, and accessed the PII of approximately 36 million Xfinity customers (the "Data Breach" or "Breach" herein).

5.    As a direct and proximate result of Comcast's failure to implement and follow basic security procedures, Plaintiffs' and Class Members' PII are now in the hands of cybercriminals.

6.    Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harm caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

7.    As such, on behalf of himself and all others similarly situated, Plaintiffs bring claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief.

## PARTIES

8.    Plaintiff Centoria Gunther is an adult who at all relevant times is a citizen of the Commonwealth of Pennsylvania and resident of Chester, Pennsylvania. Plaintiff Gunther has been a customer of Comcast and user of Comcast's Xfinity internet services for approximately eleven years.

9.     Plaintiff Alyssia Nanez is an adult who at all relevant times is a citizen of the State of California and resident of Lathrop, California. At all relevant times, Plaintiff Nanez was a customer of Comcast and user of Comcast's Xfinity internet services.

10.     As a result of the Data Breach, Plaintiffs will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

11.     Defendant Comcast Cable Communications LLC is a Delaware limited liability company that maintains its headquarters at Comcast Center, 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103.

12.     Upon information and belief, Comcast Corporation is the only member of Comcast Cable Communications LLC.

13.     Comcast Corporation is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

14.     Defendant is a citizen of each state in which its members is a citizen. As such, Defendant is a citizen of Pennsylvania.

15.     Plaintiffs will amend their Complaint should additional limited liability company members be revealed.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiffs and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of each of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

17.    This Court has personal jurisdiction over Defendant because Defendant is a citizen of the Commonwealth of Pennsylvania.

18.    This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, Defendant conducts substantial business within this District, and Defendant has harmed Class Members residing in this District.

## FACTUAL BACKGROUND

**A.    Defendant Provides Technology Services Involving Highly Sensitive Data.**

19.    Comcast provides telecommunications and internet connectivity services in the United States to residential and business customers through Xfinity.[1]

20.    Xfinity provides a range of WiFi options, from gig-speed WiFi that takes fewer than thirteen milliseconds to load, to its "Internet Essentials" low-cost internet.[2] Xfinity also provides nationwide coverage through access to more than twenty million hotspots.[3]

21.    Xfinity, which claims to be the "largest internet provider in the U.S.," has an extremely large customer base.[4]

22.    According to its 2022 Annual Report, Comcast provides its various cable communications services to more than thirty-four million customers.[5] While Comcast primarily

---

[1] Comcast 2022 Annual Report on Form 10-K, https://www.cmcsa.com/static-files/156da323-653e-4cc6-9bb4-d239937e9d2f (last visited Dec. 21, 2023).
[2] *Overview*, Xfinity, https://www.xfinity.com/overview (last visited Dec. 21, 2023).
[3] *Id.*
[4] *Connectivity & Platforms*, Comcast, https://corporate.comcast.com/company/connectivity-platforms (last visited Dec. 21, 2023).
[5] Annual Report, *supra* note 1.

serves residential customers, Comcast boasts that its business division is growing as well, and "approaching $10 billion in annual revenue."[6]

23.     In order to use Comcast's Xfinity services, customers must create an online account with Defendant. In doing so, customers provide, and Comcast routinely acquires and stores on its systems, PII.

24.     Customers are entitled to security of their PII. As a vendor storing sensitive data, Comcast has a duty to ensure that such information is not disclosed or disseminated to unauthorized third parties.

**B.     The Xfinity Data Breach**

25.     On December 18, 2023, Comcast began to disseminate notice to customers about the Data Breach (the "Notice").[7]

26.     In the Notice, Comcast described the circumstances surrounding the Breach as follows:

> On October 10, 2023, one of Xfinity's software providers, Citrix, announced a vulnerability in one of its products used by Xfinity and thousands of other companies worldwide. At the time Citrix made this announcement, it released a patch to fix the vulnerability. Citrix issued additional mitigation guidance on October 23, 2023. We promptly patched and mitigated our systems.
>
> However, we subsequently discovered that prior to mitigation, between October 16 and October 19, 2023, there was unauthorized access to some of our internal systems that we concluded was a result of this vulnerability. We notified federal law enforcement and conducted an investigation into the nature and scope of the incident. On November 16, 2023, it was determined that information was likely acquired.[8]

---

[6] *Connectivity & Platforms*, *supra* note 4.
[7] *Notice to Customers of Data Security Incident*, Xfinity (Dec. 18, 2023), https://assets.xfinity.com/assets/dotcom/learn/Notice%20To%20Customers%20of%20Data%20Security%20Incident.pdf?INTCMP=dsi-12152023("Notice") (last visited Dec. 21, 2023).
[8] *Id.*

27.    The delay in Comcast's implementation of the patch allowed hackers to have unauthorized access to Comcast's systems.

28.    Once able to access Comcast's systems, these malicious third-party hackers stole information including usernames and hashed passwords, names, contact information, last four digits of social security numbers, dates of birth, and secret security questions and answers.[9]

29.    The information obtained in the Data Breach contains the PII of approximately thirty-six million individuals.[10]

**C.    Defendant Obtains, Collects, and Stores Plaintiffs' and Class Members' PII**

30.    In the ordinary course of doing business with its customers, Comcast regularly requires Plaintiffs and Class Members to provide their PII. In its Privacy Policy, Comcast declares it "follow[s] industry-standard practices to secure the information [Comcast] collect[s] to prevent the unauthorized access, use, or disclosure of any personal information [Comcast] collect[s] and maintain[s]."[11]

31.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Comcast assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

32.    Plaintiffs and Class Members reasonably expect that service providers such as Comcast will use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

---

[9] *Id.*
[10] Data Breach Notifications, Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/49e711c6-e27c-4340-867c-9a529ab3ca2c.shtml(last visited Dec. 21, 2023).
[11] *Privacy Policy*, Xfinity, https://www.xfinity.com/privacy/policy (last visited Dec. 21, 2023).

33.     Comcast acknowledges its obligation to keep its customers' PII confidential, stating, "Your privacy matters to us," and, "We are committed to protecting your privacy."[12]

34.     Plaintiffs and Class Members had a reasonable expectation, based in part on Comcast's own statements, that their sensitive personal information would be protected. However, despite Comcast's stated commitment to data security, Comcast failed to adopt reasonable measures to prevent the unauthorized access to Plaintiffs' and Class Members' PII, and allowed for the release of said information to unauthorized bad actors.

35.     Had Comcast maintained its data security network and worked diligently to correct vulnerabilities, remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Comcast could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential PII.

**D.     The Value of Private Information and Effects of Unauthorized Disclosure**

36.     Comcast was well aware that the protected PII which it acquires is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

37.     Comcast also knew that a breach of its computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

38.     PII is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical

---

[12] *Privacy*, Xfinity, https://www.xfinity.com/privacy (last visited Dec. 21, 2023).

and financial fraud.[13] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

39.    Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available.

40.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing twenty-two billion records. The United States specifically saw a 10% increase in the total number of data breaches.[14]

41.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[15]

42.    The ramifications of Comcast's failure to keep Plaintiffs' and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[13] *What To Know About Identity Theft*, Fed. Trade Comm'n Consumer Advice (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Dec. 21, 2023).

[14] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/ (last visited Dec. 21, 2023).

[15] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Dec. 21, 2023).

43.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[16]

44.     Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

45.     A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[17]

46.     Due to high-profile data breaches at other companies, Comcast knew or should have known that its computer systems would be targeted by cybercriminals.

---

[16] Erika Harrell, Bureau of Just. Stat., U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft, 2018 I* (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Dec. 21, 2023).
[17] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited Dec. 21, 2023).

47.     Comcast also knew or should have known the importance of safeguarding the PII with which it was entrusted and of the foreseeable consequences if its data security systems were breached. Comcast failed, however, to take adequate cybersecurity measures to prevent the Data Breach and release of its customers PII from occurring.

**E.     FTC Guidelines**

48.     Comcast is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

49.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[18]

50.     The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[19]

51.     The FTC recommends that businesses:

a.     Identify all connections to the computers where sensitive information is stored;

b.     Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c.     Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

---

[18] *Start with Security: A Guide for Business*, Fed. Trade Comm'n (June 2015) https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Dec. 21, 2023).
[19] Erika Harrell, Bureau of Just. Stat., U.S. Dep't of Just., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf last visited Dec. 21, 2023).

d.   Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e.   Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f.   Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.   Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h.   Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.   Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

52.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

53.     Upon information and belief, Comcast failed to properly implement one or more of the basic data security practices described above. Comcast's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII resulted in the unauthorized release of Plaintiffs' and Class Members' PII to threat actors. Further, Comcast's failure to implement basic data security practices constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

54.     Comcast was, at all times, fully aware of its obligations to protect the PII of consumers because of its business model of collecting PII and storing payment information. Comcast was also aware of the significant repercussions that would result from its failure to do so.

55.     Comcast's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**F.      Plaintiffs and Class Members Suffered Damages**

56.     The ramifications of Comcast's failure to keep user PII secure are long lasting and severe. Consumer victims of data breaches are more likely to become victims of identity fraud, occurring 65 percent of the time.[20]

57.     In 2021 alone, identity theft victims in the United States had financial losses totaling $16.4 billion.[21]

---

[20] *What Are Your Odds of Getting Your Identity Stolen?*, IdentityForce (Apr. 15, 2021), https://www.identityforce.com/blog/identity-theft-odds-identity-theft-statistics (last visited Dec. 21, 2023).

[21] Erika Harrell & Alexandra Thompson, *Victims of Identity Theft, 2021*, U.S. Dept. Just., Bureau Just. Stats. (Oct. 2023), https://bjs.ojp.gov/document/vit21.pdf (last visited Dec. 19, 2023).

58.    Besides the monetary damage sustained, consumers may also spend anywhere from one day to more than six months resolving identity theft issues.[22]

59.    Ultimately, the time that victims spend monitoring and resolving identity theft issues takes an emotional toll. Approximately 80% of victims of identity theft experienced some

type of emotional distress, and more than one-third of victims experienced moderate or severe emotional distress.[23]

60.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

61.    As a result of Comcast's failure to prevent the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer injuries, including loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their highly valuable PII; the imminent and certainly impending injury flowing from fraud and identity theft posed by their PII being placed in the hands of criminals; damages to and diminution in value of their PII that was entrusted to Defendant with the understanding the Defendant would safeguard the PII against disclosure; and continued risk to Plaintiffs' and the Class Members' PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII with which it was entrusted.

---

[22] *Supra* note 20.
[23] *Id.*

## CLASS ALLEGATIONS

62.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

63.    Plaintiffs propose the following Class and Subclass definitions, subject to amendment as appropriate:

> **All persons identified by Defendant (or its agents or affiliates) as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Class).**

> **All persons identified by Defendant (or its agents or affiliates) as being among those individuals residing in California impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "California Subclass").**

64.    Collectively, the Class and California Subclass are referred to as the "Classes".

65.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

66.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes prior to moving for class certification.

67.    On December 20, 2023, Plaintiff Nanez received a Notice of Data Security Incident (the "Notice") from Defendant informing her that her PII had been involved in the Data Breach. Plaintiff Nanez is deeply concerned about protecting her PII from public disclosure: her and her family pride themselves on maintaining high security in their household. Consequently, Plaintiff Nanez and her family are deeply shocked and concerned about the Data Breach,

especially since she has never had any data issues previously. In fact, compounding the issues brought by the Data Breach in question, Plaintiff Nanez's son's Roblox account was recently hacked.  Following a conversation with a Roblox agent, Plaintiff Nanez was made aware that someone in New York accessed her son's account. Thereafter, Plaintiff Nanez changed all passwords and installed 2-step verification.

68.     Additionally, Plaintiff Nanez and her family members are receiving waves of mobile spam on their iPhones "around the clock," a situation that never arose prior to this Data Breach.

69.     To date, Plaintiff Nanez has spent approximately ten hours mitigating the effects of the Data Breach.

70.     Between this Data Breach and the incident involving her son's Roblox account, Plaintiff Nanez changed all passcodes, added in double authentication mechanisms, and overall bolstered her data privacy defenses on her own accord, time, and dollar.

71.     On December 20, 2023, Plaintiff Gunther received the Notice from Defendant. Plaintiff Gunther is deeply concerned about protecting her PII from public disclosure. Specifically, Plaintiff Gunther is concerned about her PII being made available on the Dark Web as a result of the Data Breach. Over the past few months, Plaintiff Gunther noticed a dramatic increase of spam on her electronic devices and suspicious items on her credit report.

72.     Since the announcement of the Data Breach, Plaintiffs have been required to spend valuable time monitoring various accounts to detect and prevent any misuses of his PII— time which he would not have had to expend but for the Data Breach.

73.     **Numerosity.** The Class described above are so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual

claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to, the files implicated in the Data Breach. Based upon public filings, the number of people impacted is approximately thirty-six million.

74.     **Commonality.** This action involves questions of law and fact that are common to the Class Members, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.      Whether and to what extend Defendant had a duty to protect the PII of Plaintiffs and Class Members;

b.      Whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' PII;

c.      Whether Defendant had duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

d.      Whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PII;

e.      Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

f.      Whether Defendant breached its duties to exercise reasonable care in handling Plaintiffs' and Class Members' PII;

g.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.     Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

i.     Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

j.     Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

75.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class Members. The claims of Plaintiffs and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Plaintiffs and Class Members entrusted Defendant with their PII, and it was subsequently released to an unauthorized third party.

76.    **Adequacy of Representation.** Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the other Class Members Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

77.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

78.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant breached its duty and released Plaintiffs' and Class Members' PII, then Plaintiffs and each Class member suffered damages by that conduct.

79.    Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

80.    Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particularly issues include, but are not limited to:

a.    If Defendant failed to timely notify the public of the Data Breach;

b.    If Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.    If Defendant's security measures to protect their data systems were

reasonable in light of best practices recommended by data security experts;

d.      If Defendant's failure to institute adequate protective security measures amounted to negligence;

e.      If Defendant failed to take commercially reasonably steps to safeguard consumer PII; and

f.      If adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

81.      Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
*(On Behalf of Plaintiffs and the Class)*

82.      Plaintiffs restate and reallege all proceeding allegations as if fully set forth herein.

83.      Comcast owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

84.      Specifically, this duty included, among other things: (a) designing, maintaining, and testing Comcast's security systems to ensure that Plaintiffs' and Class Members' PII in Comcast's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings

and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

85. Comcast's duty to use reasonable care arose from several sources, including, but not limited to those described below.

86. Comcast had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Comcast was obligated to act with reasonable care to protect against these foreseeable threats.

87. Comcast admits that it has the responsibility to protect the customer data with which it was entrusted. Yet, Comcast did not live up to that responsibility.

88. Comcast breached the duties owed to Plaintiffs and Class Members and thus was negligent. Comcast breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiffs and Class Members; (b) detect the breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) promptly disclose that Plaintiffs' and Class Members' PII in Comcast's possession had been or was reasonably believed to have been, stolen or compromised.

89. But for Comcast's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their PII would not have been compromised.

90. As a direct and proximate result of Comcast's negligence, Plaintiffs and Class Members have suffered injuries including:

a. Theft of their PII;

b.     Costs associated with requesting credit freezes;

c.     Costs associated with the detection and prevention of identity theft;

d.     Costs associated with purchasing credit monitoring and identity theft protection services;

e.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.     The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h.     Damages to and diminution in value of their PII entrusted to Comcast with the mutual understanding that Comcast would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; and

i.     Continued risk of exposure to hackers and thieves of their PII, which remains in Comcast's possession and is subject to further breaches so long as Comcast fails to undertake appropriate and adequate measures to protect Plaintiffs and Class Members.

91.     As a direct and proximate result of Comcast's negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
#### *(On Behalf of Plaintiffs and the Class)*

92.    Plaintiffs restates and realleges all proceeding factual allegations as if fully set forth herein.

93.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Comcast for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Comcast's duty.

94.    Comcast violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Comcast's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

95.    Comcast's violation of Section 5 of the FTC Act constitutes negligence *per se.*

96.    Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

97.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

98.    As a direct and proximate result of Comcast's negligence, Plaintiffs and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT
### *(On Behalf of Plaintiffs and the Class)*

99.     Plaintiffs restate and realleges all preceding allegations above as if fully set forth herein.

100.     Comcast required Plaintiffs and Class Members to provide their PII as a condition for using Xfinity's services.

101.     In doing so, Plaintiff and Class Members entered into implied contracts with Comcast by which Defendant agreed to safeguard and protect such PII, keep such PII secure and confidential, and to timely and accurately notify Plaintiffs and Class Members if their PII had been breached, compromised, or stolen.

102.     When entering into these implied contracts, Plaintiffs and Class Members reasonably believed and expected that Comcast's data security practices complied with its statutory and common law duties to adequately protect Plaintiffs' and Class Members' PII and to timely notify them of a data breach.

103.     Indeed, implicit in these exchanges was a promise by Defendant to ensure the PII of Plaintiffs and Class members in its possession would be used to provide the agreed-upon services and that Comcast would take adequate measures to protect Plaintiffs' and Class Members' PII and timely notify them in the event of a data breach.

104.     It is clear by these exchanges that the parties intended to enter into implied agreements supported by mutual assent. Plaintiffs and Class Members would not have disclosed their PII to Defendant but for the prospect of Defendant's promise of services. Conversely, Comcast presumably would not have taken Plaintiffs' and Class Members' PII if it did not intend to provide Plaintiffs and Class Members services through Xfinity.

105.   Plaintiffs and Class Members would not have provided their PII to Comcast had they known that Defendant would not safeguard their PII as promised, or provide timely notice of a data breach.

106.   Plaintiffs and Class Members fully performed their obligations under their implied contracts with Xfinity.

107.   Xfinity breached its implied contracts with Plaintiffs and Class Members by failing to safeguard Plaintiffs' and Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

108.   The losses and damages Plaintiffs and Class Members sustained, include, but are not limited to:

   a.   Theft of their PII;

   b.   Costs associated with requested credit freezes;

   c.   Costs associated with the detection and prevention of identity theft and unauthorized use of the PII;

   d.   Costs associated with purchasing credit monitoring and identity theft protection services;

   e.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

   f.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and

imposing withdrawal and purchase limits on compromised accounts;

g.      The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of cyber-criminals;

h.      Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; and

i.      Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' PII.

109.    As a direct and proximate result of Comcast's breach of contract, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
*(On Behalf of Plaintiffs and the Class)*

110.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

111.    Plaintiffs bring this claim in the alternative to their breach of implied contract claim.

112.    By engaging in the conduct described in this Complaint, Comcast has knowingly obtained and derived benefits from Plaintiffs and Class Members at Plaintiffs' and Class

Members' expense, namely the profits gained from payment in exchange for the use of Comcast's services, such that it would be inequitable and unjust for Defendant to retain.

113.    By engaging in the acts and failures to act described in this Complaint, Comcast has been knowingly enriched by the savings in costs that should have been reasonably expensed to protect the PII of Plaintiffs and the Class. Defendant knew or should that known that theft of consumer PII could happen, yet it failed to take reasonable steps to pay for the level of security required to have prevented the theft of its consumers' PII.

114.    Comcast's failure to direct profits derived from Plaintiffs' and Class Members' payments for services toward safeguarding Plaintiffs' and Class Members' PII constitutes the inequitable retention of a benefit without payment for its value.

115.    Comcast will be unjustly enriched if it is permitted to retain the benefits derived after the theft of Plaintiffs' and Class Members' PII.

116.    Plaintiffs and Class Members have no adequate remedy at law. As a direct and proximate result of Comcast's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

117.    Comcast should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

<u>**FIFTH CAUSE OF ACTION**</u>
**Violation of the California Unfair Competition Law**
**[Cal. Bus. & Prof. Code § 17200, *et seq.* – Unlawful Business Practices]**
*(On Behalf of the California Subclass)*

118.    Plaintiffs re-allege and incorporate by reference herein all of the allegations as if fully set forth herein.

119.    Defendant violated Cal. Bus. and Prof. Code § 17200, et seq., by engaging in

unlawful, or fraudulent business acts and practices and unfair, deceptive, untrue, or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Class.

120.    Defendant engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class Members' PII with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and Class Members' PII in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Defendant to take reasonable methods for safeguarding the PII of Plaintiffs and the Class Members.

121.    In addition, Defendant engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.

122.    As a direct and proximate result of Defendant's unlawful practices and acts, Plaintiffs and Class Members were injured and lost money or property, including, but not limited to, the price received by Defendant for the products and services, the loss of Plaintiffs' and Class Members' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described herein.

123.    Defendant knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class Members.

124.    Plaintiffs, on behalf of the Class, seeks relief under Cal. Bus. & Prof. Code § 17200, et seq., including, but not limited to, restitution to Plaintiffs and Class Members of money or property that Defendant may have acquired by means of its unlawful, and unfair business practices, disgorgement of all profits accruing to Defendant because of its unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

**SIXTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
***(On Behalf of Plaintiffs and the Class)***

125.    Plaintiffs restates and realleges all proceeding factual allegations as if fully set forth herein.

126.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

127.    Comcast owes a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' PII.

128.    Comcast still possesses PII regarding Plaintiffs and Class Members.

129.    Plaintiffs alleges that Comcast's data security measures remain inadequate. Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of his PII, and the risk remains that further compromises of their PII will occur in the future.

130.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Comcast owes a legal duty to secure consumers' PII and to timely notify

consumers of a data breach under the common law and Section 5 of the FTC Act; and

b.    Comcast continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiffs' and Class Members' PII.

131.    This Court also should issue corresponding prospective injunctive relief requiring Comcast to employ adequate security protocols consistent with law and industry standards to protect consumers' PII.

132.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Comcast. The risk of another such breach is real, immediate, and substantial. If another breach at Comcast occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

133.    The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Comcast if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Comcast of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Comcast has a pre-existing legal obligation to employ such measures.

134.    Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Comcast, thus eliminating the additional injuries that would result to Plaintiffs and consumers whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

1.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

2.    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

3.    For damages in an amount to be determined by the trier of fact;

4.    For an order of restitution and all other forms of equitable monetary relief;

5.    Declaratory and injunctive relief as described herein;

6.    Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

7.    Awarding pre- and post-judgment interest on any amounts awarded; and,

8.    Awarding such other and further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: December 21, 2023                    Respectfully submitted,

*/s/ James A. Francis*
JAMES A. FRANCIS (Bar No. 77474)
JOHN SOUMILAS
LAUREN KW BRENNAN
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel. (215) 735-8600
Fax (215) 940-8000
jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com
lbrennan@consumerlawfirm.com

Edward W. Ciolko (*Pro Hac Vice Motion to be Filed*)
Jennifer S. Czeisler (Pro Hac Vice Motion to be Filed)
**STERLINGTON, PLLC**
One World Trade Center,
285 Fulton St. 85th Floor,
New York, New York 10007
Tel. (212) 433-2993
jen.czeisler@sterlingtonlaw.com
edward.ciolko@sterlingtonlaw.com

James M. Evangelista (*pro hac vice* to be filed)
**EVANGELISTA WORLEY LLC**
500 Sugar Mill Road
Suit 245A
Atlanta, GA 30350
Tel: (404) 205-8400
Fax: (404) 205-8395
jim@ewlawllc.com